**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**MICHAEL W. LATTYAK**,

           Plaintiff,

    **v.**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

           Defendant.

**09cv805**

**ELECTRONICALLY FILED**

**MEMORANDUM OPINION**

**October 28, 2009**

**I.**      **Introduction**

Plaintiff, Michael W. Lattyak, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act, seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for  Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Consistent with the customary practice in the Western District of Pennsylvania, the parties have submitted cross motions for summary judgment on the record developed at the administrative proceedings.  After careful consideration of the Administrative Law Judge's ("ALJ") Decision, the memoranda of the parties, and the entire record, the Court will grant the Commissioner's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

**II.**      **Procedural History**

On June 8, 2007, Plaintiff applied for DIB and SSI alleging disability since May 31, 2007

1

due to multiple sclerosis. R. 120-123, 142, 147.[1] For the purposes of his DIB claim, Plaintiff's

date last insured was December 31, 2011, meaning that he had to establish he was disabled on or

before that date in order to be entitled to a period of disability and DIB.  R. 16.  After his initial

claim was denied on September 19, 2007, Plaintiff timely requested a hearing on October 11,

2007.  R. 95. The hearing was held before ALJ Mattie Harvin-Woode on September 30, 2008, at

which Plaintiff testified along with a vocational expert (VE).  R. 31-74.

On November 21, 2008, the ALJ denied Plaintiff's claim, finding Plaintiff not disabled.

The ALJ also found that Plaintiff could perform work at the sedentary level.  After the denial,

Plaintiff requested a review of the ALJ's decision.  The Appeals Council denied Plaintiff's

Request for Review on January 21, 2009, and the ALJ's decision became the final decision of the

Commissioner.  Plaintiff then filed his complaint seeking judicial review of the Commissioner's

decision.

III.    **Statement of the Case**

The ALJ found that the record supported a finding of a severe impairment of multiple

sclerosis. R. 18.  The ALJ examined Plaintiff's medical records relating to his physical and

mental capabilities and discussed portions of Plaintiff's testimony where he described his daily

activities.  R. 18-23.  The ALJ found that the objective evidence of record could not support a

finding that Plaintiff's depression was severe or that he met listing 12.04 for Affective Disorders.

R. 18.  Although Plaintiff testified that he had problems with concentration and focus, Plaintiff's

mental status examinations were normal. He further testified to being involved in a leadership

position with Narcotics Anonymous and in bible study.  R. 19, 56-58. Furthermore, Plaintiff

---

[1]R. refers to the administrative transcript.

testified to assisting in childcare duties and managing finances.  *Id.*

In addition, the ALJ discounted the opinion of Dr. Asim Roy that Plaintiff met listing 11.09 for Multiple Sclerosis and was therefore disabled.  R. 20-21, 21-23. She found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible. . . ." R. 22. The ALJ noted that Plaintiff maintained the ability to drive, shop, perform self-care, and do light housework. R. 22.  Physical examinations performed by Plaintiff's treating physicians were normal.  R. 23.  Dr. Matthews noted that Plaintiff could not return to his prior work as a mechanic, but instead wanted vocational retraining for other work.  R. 23. The ALJ also gave some weight to the opinion of the consultative examiner, Dr. Mitchell Felder, who found that Plaintiff was capable of light work with some additional limitations.  *Id.*

The ALJ made the following specific findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since May 31, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairment: multiple sclerosis (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant must be able to sit or stand as needed; he can only occasionally perform pushing and pulling,

climbing, balancing, kneeling, crawling, stooping, crouching, or bending; he cannot work around unprotected heights or moving machinery; and he cannot be exposed to extreme humidity or temperatures.

6.      The claimant is unable to perform any past relevant work (20 CFR 404. 1565 and 416.956).

7.      The claimant was born on June 21, 1970 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, residual functional capacity, there are jobs that exist in significant numbers in the national economy that he claimant can perform. (20 CFR 404.1569, 404.1569a,  404.1569, 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2007 through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

R. 18-25.

## IV.      Standards of Review

Judicial review of  the Commissioner's final decisions on disability claims is provided by statute.  42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3].  Section 405(g) permits a district court to review

_____

[2]  Section 405(g) provides in pertinent part:
Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. . .

transcripts and records upon which a determination of the Commissioner is based.  Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding standards under Title XVI; 42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a).  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002).

<u>Substantial Evidence</u>

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla" of evidence, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005); *Ventura*, 55 F.3d at 901 (*quoting Richardson*); *Stunkard v. Secretary of*

---

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.
42 U.S.C. § 1383(c)(3).

*HHS*, 841 F.2d 57, 59 (3d Cir. 1988).

The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983).

In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact finder. *Rutherford*, 399 F.3d at 552. In making this determination, the district court considers and reviews only those findings upon which the ALJ based his or her decision, and cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87"; parallel and other citations omitted).

Five Step Determination Process

To qualify for DIB under Title II of the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987);  42 U.S.C. § 423 (d)(1) (1982). Similarly, to qualify for SSI, the claimant must show "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1383c(a)(3)(A).

When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the Commissioner utilizes the familiar five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920 (1995).  *See Sullivan*, 493 U.S. at 525.  The Court of Appeals for the Third Circuit summarized this five step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999):

> In *step one*, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C .F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. . . . In *step two*, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

> In *step three*, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Step four* requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. . . .

     If the claimant is unable to resume her former occupation, the evaluation moves to the final *step* [*five*]. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ *must analyze the cumulative effect of all the claimant's impairments* in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step. . . .

*Plummer*, 186 F.3d at 428 (italics supplied; certain citations omitted). *See also Rutherford*, 399 F.3d at 551 ("In the first four steps the burden is on the claimant to show that she (1) is not currently engaged in gainful employment because she (2) is suffering from a severe impairment (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)). If the claimant satisfies step 3, she is considered per se disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform (Reg. § 920(f)).").

     Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to qualify for benefits in one of two ways:

     (1)  by introducing medical evidence that the claimant is disabled *per se* because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, or that the impairment is *equivalent* to a Listed Impairment.  *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983);  *Stunkard*, 841 F.2d at 59;  *Kangas*, 823 F.2d at 777 (Steps 1-3); or,

     (2) in the event that the claimant suffers from a less severe impairment, he or she will be deemed disabled where he or she is nevertheless unable to engage in "any other kind of substantial

gainful work which exists in the national economy . . . ."  *Campbell*, 461 U.S. at 461 (*citing* 42 U.S.C. § 423 (d)(2)(A)). In order to prove disability under this second method, the plaintiff must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4).  *Stunkard,* 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that he or she is unable to resume his or her previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Campbell*, 461 U.S. at 461; *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003); *Stunkard*, 842 F.2d at 59;  *Kangas*, 823 F.2d at 777.

<u>Vocational Expert - Hypothetical Questions</u>

The determination of whether a claimant retains the RFC to perform jobs existing in the workforce at step 5 is frequently based in large measure on testimony provided by the vocational expert.  *Rutherford*, 399 F.3d at 553, citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (citations omitted).  Where a hypothetical question to the VE accurately sets forth all of a claimant's significant impairments and restrictions in activities, physical and mental, as found by the ALJ or as  uncontradicted on the medical record, the expert's response as to the existence of jobs in the national economy which the claimant is capable of performing may be considered substantial evidence in support of the ALJ's findings as to the claimant's RFC.  *See, e.g., Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002), *citing Podedworny*, 745 F.2d at 218 *and Chrupcala v. Heckler*, 829 F.2d, 1276 (3d Cir. 1987) (leading cases on the use of hypothetical questions to VEs).[4] *See also*

---

[4]Conversely, because the hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments," *Chrupcala*, 829 F.2d at 1276, where there exists on the record "medically undisputed evidence of specific impairments not included in a hypothetical question

*Plummer*, 186 F.3d at 428 (factors to be considered in formulating hypothetical questions include medical impairments, age, education, work experience and RFC); *Boone*, 353 F.3d at 205-06 ("At the fifth step of the evaluation process, 'the ALJ often seeks advisory testimony from a vocational expert.'").  Objections to the adequacy of an ALJ's hypothetical questions to a vocational expert "often boil down to attacks on the RFC assessment itself."  *Rutherford*, 399 F.3d at 554 n.8.

Additionally, the ALJ will often consult the Dictionary of Occupational Titles ("DOT"), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002); *see also Id.* at 126 (The "Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT].") (citing 20 C.F.R. § 416.966(d) (2002)).   While an unexplained conflict between a VE's testimony and the relevant DOT job descriptions does not *necessarily* require reversal or remand of an ALJ's determination, the United States Court of Appeals for the Third Circuit requires the ALJ to address and resolve any material inconsistencies or conflicts between the DOT descriptions and the VE's testimony, and failure to do so will necessitate a remand.  *Boone*, 353 F.3d at 206.

<u>Multiple Impairments</u>

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/ Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively, they

---

to a vocational expert, the expert's response is not considered substantial evidence."
*Podedworny*, 745 F.2d at 218.

meet or equal the severity of a Listed Impairment. *Burnett*, 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the 'Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity,'"), *citing* 42 U.S.C. § 423(d)(2)(C), and 20 C.F.R. § § 404.1523, 416.923).

Section 404.1523 of the regulations, 20 C.F.R. § 404.1523, Multiple impairments, provides:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

Even if a claimant's impairment does not meet the criteria specified in the listings, he or she must be found disabled if his or her condition is *equivalent* to a listed impairment. 20 C.F.R. § 404.1520(d). When a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the Secretary denies the payment of disability benefits." *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir.1971). To that end, the ALJ may not just make conclusory statements that the impairments do not equal a listed impairment in combination or alone, but must set forth the reasons for his or her decision, and *specifically* explain why he or she found that the claimant's impairments did not, alone or in combination, equal in severity one of the listed impairments. *Fargnoli*, 247 F.3d at 40 n. 4, *citing Burnett*, 220 F.3d at 119-20.

11

If the ALJ or Commissioner believes that the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to his or her past employment or perform other substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [he/she] believed was needed to make a sound determination." *Ferguson*, 765 F.2d 36.

<u>Claimant's Subjective Complaints of Impairments and Pain</u>

An ALJ must do more than simply state factual conclusions.  Instead, he or she must make specific findings of fact to support his or her ultimate findings. *Stewart*, 714 F.2d at 290. The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected.  *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir.1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981).  He or she must also give serious consideration to the claimant's subjective complaints, even when those assertions are not fully confirmed by objective medical evidence.  *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993); *Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir.1986).

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65, *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.* Where a medical impairment that could reasonably cause the alleged symptoms exists,

the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work.  This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.  *See* 20 C.F.R. § 404.1529(c).  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision.  *See Cotter*, 642 F.2d at 705.  Our Court of Appeals has stated:  "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.  The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work."  *Schaudeck*, 181 F.3d at 433.

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight.  *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195.  That is, while "there must be objective medical evidence of some condition that could reasonably produce pain, *there need not be objective evidence of the pain itself.*" *Green,* 749 F.2d at 1070-71 (emphasis added), *quoted in Mason,* 994 F.2d at 1067.  Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount the claimant's pain *without contrary medical evidence. Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (emphasis added); *Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987); *Akers v. Callahan,* 997 F.Supp. 648, 658 (W.D.Pa. 1998).  "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere

13

disbelief of the claimant's evidence.  Instead, the Secretary must present *evidence to refute the claim*. *See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence)." *Williams v. Sullivan,* 970 F.3d 1178, 1184-85 (3d Cir. 1992) (emphasis added), *cert. denied* 507 U.S. 924 (1993).

In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician; "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports . . . ." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

<u>Medical Opinions of Treating Sources</u>

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer*, 186 F.3d at 429 (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)) . . . ." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). The ALJ must weigh conflicting medical evidence and can chose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id.* at 317, *quoting Plummer*, 186 F.3d at 429 (additional citations omitted). The ALJ must consider all medical findings that support a treating physician's

assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion. *Morales*, 225 F.3d at 317-318 (citations omitted).

> Moreover, the Commissioner/ALJ

>> must "explicitly" weigh all relevant, probative and available evidence. . . . [and] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. . . . The [Commissioner] may properly accept some parts of the medical evidence and reject other parts, but she must *consider* all the evidence and *give some reason for discounting* the evidence she rejects.

*Adorno*, 40 F.3d at 48 (emphasis added; citations omitted). *See also Fargnoli,* 247 F.3d at 42-43 (although an ALJ may weigh conflicting medical and other evidence, he or she must give some indication of the evidence that he or she rejects and explain the reasons for discounting the evidence; where an ALJ failed to mention significant contradictory evidence or findings, the Court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving the Court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . ."); *Burnett*, 220 F.3d at 121 ("In making a residual functional capacity determination, the ALJ must consider all evidence before him. . . .  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

Medical Source Opinion of "Disability"

A medical statement or opinion expressed by a treating source on a matter reserved for the

Commissioner, such as a statement that the claimant is "disabled" or "unable to work," is not dispositive or controlling. *Adorno*, 40 F.3d at 47-48, *citing Wright v. Sulllivan*, 900 F.2d 675, 683 (3d Cir. 1990) ("this type of [medical] conclusion  cannot be controlling. 20 C.F.R. § 404.1527 (1989) indicates that [a] statement by your physician that you are disabled or unable to work does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that you are disabled.") (internal citations omitted).

The rules and regulations of the Commissioner and the SSA make a distinction between (i) medical opinions about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and physical or mental restrictions, on the one hand, and (ii) medical opinions on matters reserved for the Commissioner, such as an opinion that a claimant is "disabled" or "unable to work," on the other. The latter type of medical opinions are on matters which require dispositive administrative findings that would direct a determination of disability. *Compare* 20 C.F.R. §404.1527(a-d) (2002) (consideration and weighing of medical opinions) *with* 20 C.F.R. §404.1527(e) (2002) (distinguishing medical opinions on matters reserved for the Commissioner).

 The regulations state that the SSA will "always consider medical opinions in your case record," and states the circumstances in which an opinion of a treating source is entitled to "controlling weight." 20 C.F.R. §404.1527(b), (d) (2002).[5]  Medical opinions on matters reserved

---

[5]Subsection (d) states: "How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider [a list of] factors in deciding the weight we give to any medical opinion." 20 C.F.R. 404.1527(d) (2002). Subsection (d)(2) describes the "treatment relationship," and states:

for the Commissioner are not entitled to "any special significance," although they must always be considered. 20 C.F.R. §404.1527(e)(1-2) (2002). The Commissioner's Social Security Ruling ("SSR") 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Policy Interpretation Ruling, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," explain in some detail the distinction between medical opinions entitled to controlling weight and those reserved to the Commissioner.

SSR 96-2p explains that a "finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p, Purpose No. 7. Where a medical opinion is not entitled to controlling weight or special significance because it is on an issue reserved for the

---

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, *we will give it controlling weight*. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. *We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion*.

20 C.F.R. § 404.1527(d)(2) (2002) (emphasis added).

Commissioner,[6] these Social Security Rulings provide that, because an adjudicator is required to evaluate *all* evidence in the record that may bear on the determination or decision of disability, "adjudicators must *always* carefully consider medical source opinions about any issue, including opinions about those issues that are reserved to the Commissioner," and that such opinions "must *never* be ignored. . . ." SSR 96-5p, Policy Interpretation, (emphasis added). Moreover, because the treating source's opinion and other evidence is "important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Id.*

A medical opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2). *See* note 4, *supra*. Where an opinion by a medical source is not entitled to controlling weight, the following factors are to be considered: the examining relationship, the treatment relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization and other miscellaneous factors. 20 C.F.R. § 404.1527 (d)(1-6).

State Agency Medical and Psychological Consultants

Medical and psychological consultants of a state agency who evaluate a claimant based upon a review of the medical record "are highly qualified physicians and psychologists who are also

---

[6]SSR 96-5p lists several examples of such issues, including whether an individual's impairment(s) meets or equals in severity a Listed Impairment, what an individual's RFC is and whether that RFC prevents him or her from returning to his or her past relevant work, and whether an individual is "disabled" under the Act.

experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 404.1527 (f)(2)(I). See also SSR 96-6p: Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants ("1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the administrative law judge and Appeals Council levels of administrative review. 2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.").

## IV.   Discussion

The gravamen of Plaintiff's argument is that the ALJ's decision is not supported by substantial evidence.  Plaintiff asserts that the ALJ (a)  failed to accord controlling weight to the opinion of Plaintiff's treating sources with respect to the severity of his MS and (b) erred in her assessment of Plaintiff's credibility.

1.   The ALJ correctly concluded that the treating sources' opinions were not entitled to controlling weight as they were not supported by the objective medical evidence.

Where the opinion on the nature and severity of claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, a treating source's opinion is to be given "controlling weight". *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Plaintiff is contending that the ALJ failed to give the proper weight to the opinion of Dr.

19

Matthews that Plaintiff was temporarily disabled from his job as a mechanic and that of Dr. Roy indicating that Plaintiff met Listing 11.09[7] and 12.04[8] and was capable of only less than sedentary work.[9]  Pl.'s Br. at 5-12.  Specifically, Plaintiff relies on the treatment records of Dr. Matthews, Dr. Paxson, and the consulting examiner, Dr. Felder in support of his argument.

In making his determinations, the ALJ relied on Plaintiff's treatment records starting

---

[7] 11.09 Multiple sclerosis. With:
  A. Disorganization of motor function as described in 11.04B; or
  B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
  C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

[8] It is noted that Dr. Roy opined that Plaintiff met only one of the four "B" criteria for Listing 12.04. At least two of the four criteria must be met in order for the Listing to be met, so he did not actually opine that Plaintiff met the listing. The "B" criteria are as follows:
  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration, persistence, or pace; or
  4. Repeated episodes of decompensation, each of extended duration;

[9] According to Plaintiff's testimony, Dr. Roy, a sleep specialist, took over for Plaintiff's MS specialist, Dr. Renu Pokharna when she left the UPMC Neurology Group. R. 59. No treatment records from Dr. Roy exist in the record. All of the records from UPMC Neurology were signed by Dr. Pokharna. In his medical source statement of September 3, 2008, Dr. Roy opined that Plaintiff could occasionally lift and carry two to three to three pounds; could stand and walk 1-2 hours in an eight hour workday; could sit for 2-4 hours in an eight hour workday; was limited in his ability push and pull with his upper and lower extremities; could occasionally bend, stoop, crouch, balance, climb, and kneel; was not required to lie down for the relief of pain; and was limited in reaching, handling, fingering, and feeling. R. 114-116. Dr. Roy opined that Plaintiff was capable of only less than sedentary work; met Listing 11.09 for MS due to an abnormal MRI, numbness, and pain; and met Listing 12.04 with anhedonia, sleep disturbance, decreased energy, feelings of guilty and worthlessness and marked difficulties in maintaining concentration, persistence, and pace. R. 118, 188-189.

from right before Plaintiff's diagnosis.  She noted Plaintiff's limitations stemming from his MS, but also noted that the remainder of his examinations were normal. Plaintiff was first seen for complaints of numbness to his hands on May 15, 2007 by his primary care physician, Dr. James Liszewski. R. 204. Upon examination, Plaintiff was intact to pinprick on his hands and the remainder of the examination was normal. A nerve conduction study was ordered. *Id*. Dr. Stephen Paxson performed the study on May 18, 2007 which indicated a clinically significant ulnar motor fiber slowing across both elbows with abnormal conduction velocity on the left. R. 193. Plaintiff represented to Dr. Liszewski on May 21, 2007 with numbness and weakness in his hands and across his abdomen. Decreased grip strength was noted in his hands and an MRI of the brain, neck, and thoracic spine was ordered. R. 204. MRIs of Plaintiff's neck, brain, and cervical spine revealed: in the region of the neck a posterior disc protrusion at T10-T11 and minimal increased signal intensity in the spinal cord at several levels; in the region of the brain, small periventricular lesions some of which had enhanced; and in the region of the cervical spine, enhancing lesions. R. 198, 201, 202. It was noted that these findings were highly suspicious of multiple sclerosis (MS). *Id*.

On May 29, 2007, Dr. Liszewski noted that Plaintiff "at this point will not be able to return to his job as a tire changer but hopefully will in the future depending on how he responds to treatment." Plaintiff was referred to Dr. Michael Matthews, a neurologist. R. 205. Plaintiff presented to Dr. Matthews on May 31, 2005 complaining of numbness, trouble with cognition, and memory. Plaintiff further reported being depressed, anxious, and angry with the idea of having MS and having a stiff sensation in the lower extremities, non-restorative sleep,

21

headaches, and Lhermitte's phenomenon.[10] R. 250. On examination, Dr. Matthews noted that

Plaintiff suffered no monoparesis[11], paraparesis[12],or heat intolerance. *Id.* Plaintiff's gait and

balance were normal; he scored 27 out of 30 on the Folstein mini-mental exam test which is

normal; and his vision was 20/30 and 20/20 minus in the eyes without corrective lenses.  R. 251.

Coordination testing showed only a very slight near point ataxia[13] on finger-to-toe movements

and heel-to-shin movements on the left as compared to the right and a slight fix on the left side

arm roll maneuver implying slight weakness. Direct strength testing was otherwise full and

symmetric. *Id.* Reflexes were 3/4 in the major muscle groups without Babinski signs. Pin and

vibratory sensation tests were felt more in the upper right versus the upper left extremity, but

were felt symmetrically in both lower extremities. *Id.* It was the opinion of Dr. Matthews that 1)

Plaintiff had relapsing-remitting MS (RRMS)[14] and 2) that the ulnar neuropathy[15] noted in the

---

[10] L'Hermitte's phenomenon, or sign, describes a sensation of pain that is triggered by flexing the neck (bending the head forward). This pain travels from the neck down the spine and into the arms or legs. Howard LeWine, M.D. "L'Hermitte's phenomenon" available at: http://www.healthline.com/sw/hr-ad-ask-the-doctor-lhermittes-phenomenon.

[11]Monoparesis is partial or complete paralysis affecting a single extremity or part of an extremity. Stedman's Medical Dictionary, 1224,1425 (28th Ed. 2006).

[12]Paraparesis is weakness affecting the lower extremities. Stedman's Medical Dictionary, 1421, 1425 (28th Ed. 2006).

[13] Ataxia is the inability to coordinate muscle activity during voluntary movement. Stedman's Medical Dictionary, 172 (28th Ed. 2006).

[14]RRMS is characterized by relapses (or exacerbations) during which time new symptoms can appear and old ones resurface or worsen. The relapses are followed by periods of remission, during which time the person fully or partially recovers from the deficits acquired by the relapse. Relapsing-Remitting Multiple Sclerosis, available at: http://www.mult-sclerosis.org/relapsingremittingmultiplesclerosis.html.

[15] Inflammation or compression of the ulnar nerve resulting in numbness, tingling, and pain in the outer side of the arm and hand near the little finger. Stedman's Medical Dictionary,

nerve conduction studies was likely related to Plaintiff's work. *Id.* Plaintiff was placed on Rebif. R. 252. Despite the findings of the examination, Dr. Matthews signed for temporary disability for Plaintiff because of the difficulty in using his left hand.[16]

On July 9, 2007, Plaintiff was seen again by Dr. Matthews who indicated that Plaintiff was reporting flu-like symptoms after injecting Rebif, occasional instability of posture, clumsiness, mild headaches, and pain the hamstrings, leg muscles, fingers, hips, neck, and head. Dr. Matthews noted only *mild* cognitive difficulties with depression, anger, noctural awakening, and nonrestorative sleep. R. 253. Dr. Matthews noted that there were no other symptoms suggestive of MS exacerbation and that the rest of his symptoms were negative. *Id*. He further indicated that Plaintiff's ulnar symptoms had eased considerably, but Plaintiff indicated that he did not think he could return to work as a mechanic and that he would have to train for another job. Upon examination Dr. Matthews noted that Plaintiff's muscle strength was full, there was no diminution of sensation in the ulnar distribution of either hand, gait and balance were normal, and that he was not depressed in appearance. *Id*. Plaintiff was placed on prednisone to counter the side effects of Rebif and amandatine for fatigue. R. 254.

Plaintiff did not have another appointment until February 18, 2008, when he was seen by Dr. Renu Pokharna, an MS specialist. Plaintiff reported that the numbness in his hands had persisted but the numbness in his stomach had ceased. He further reported pain bilaterally in his

---

1313 (28th Ed. 2006); Ulnar Neuropathy, available at:
http://www.healthline.com/galecontent/ulnar-neuropathy

[16]It is noted that this opinion of temporary disability was only in relation to Plaintiff's ability to return to his job as a tire changer and not to Plaintiff's ability to work in general. The ALJ agreed that Plaintiff was incapable of returning to his prior work as a tire changer or car mechanic. R. 23.

calf muscles, difficulty standing for long periods of time, a tendency to fall backwards when he stood, leg twitches when he slept, blurry vision at night for 1 to 2 minute intervals, night sweats, dry mouth, depression, and fatigue. R. 288, 290, 295. Plaintiff's examination was normal with intact cranial nerves; symmetrical reflexes; strength 5/5 bilaterally; sensation intact to pinprick, vibration, temperature, and position except for decreased pinprick in the dorsum of the foot and midcalf; normal tandem gait; and intact coordination. R. 290. Dr. Pokharna put Plaintiff on Effexor for his reported depression and Requip for his restless legs. R. 295.

On May 18, 2008, Plaintiff was seen by Dr. Matthews, reporting that he was "not too well." He indicated that his left lower extremity would occasionally quit working and he would fall and further indicated neck pain, headaches, and pain in his calves. R. 276. Upon physical examination, Dr. Matthews noted that Plaintiff was neatly dressed, well-groomed, and alert. He further noted that Plaintiff did not limp when walking and showed no adventitious movements. R. 276. Dr. Pokharna saw Plaintiff on June 6, 2008 where he reported headache, irritability, inability to tolerate heat, lethargy, lack of energy, and the inability to go out and work as a car mechanic. R. 282. Upon examination, Dr. Pokharna noted that Plaintiff 5/5 strength bilaterally, 20/25 vision bilaterally, normal speech, normal reflexes, intact sensation, and normal tandem gait. R. 282. Dr. Pokharna indicated she would increase Plaintiff's neurotin and prescribe him a cooling vest, but that he was tolerating the Rebif well. She further told him to drink plenty of cold fluids before going out in the sun and before going to work. R. 282.

Plaintiff also suggests that the ALJ should have given more weight to the opinion of Dr.

Felder, the consultative examiner, that Plaintiff's prognosis was "guarded."[17] However, a thorough review of Dr. Felder's record and report indicates that he opined that Plaintiff had a normal examination and was capable of "light" work as defined by the regulations, which is an RFC higher than that suggested by the ALJ.[18] This in no way supports Plaintiff's contention that the ALJ's opinion is not supported by substantial evidence. R. 255-264.

In summation, the ALJ properly relied on the records of Plaintiff's treating physicians that suggested normal physical examinations including normal reflexes, sensation, strength, and gait and minimal depression symptoms. Nothing in Plaintiff's medical records suggests that he was incapable of modified sedentary work as set forth in the RFC assessment of the ALJ. Therefore, the Court finds that the ALJ properly weighed the medical evidence in support of his conclusion that Dr. Matthews opinion of temporary disability and the reports of Dr. Roy did not warrant significant weight.

2.      The ALJ correctly judged Plaintiff's credibility.

Plaintiff argues that the ALJ erred as a matter of law by finding that Plaintiff's

---

[17] In his opinion the ALJ stated as follows: "The consultative examiner concluded that the claimant would be able to lift and carry up to twenty pounds occasionally with some additional postural and environmental restrictions that are generally consistent with the functional capacity outlined above. In general, the lifting and carrying restriction is supported by the findings consistent with multiple sclerosis on imaging studies and is consistent with the Plaintiff's complaints. Overall, however, the opinion somewhat overestimates the claimant's ability to lift and carry on a sustained basis, and further, to sustain unlimited walking and standing. Accordingly, this opinion has been given somewhat less weight in this assessment." R. 23.

[18] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567, 416.967.

"statements concerning the intensity, persistence and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the above residual functional capacity

assessment."  Plaintiff suggests that the ALJ relied on "sporadic and transitory" daily activities in

making his credibility assessment.  Pl. Brief at 13.  In his opinion, the ALJ relied on both

Plaintiff's medical records and his daily activities in assessing Plaintiff's credibility. He assessed

Plaintiff's activities as follows:

> Specifically, the claimant reports some significant alterations in his
> activities of daily living secondary to pain and fatigue, but he
> nonetheless maintains his ability to perform self-care, drive, shop,
> and manage finances. Likewise, the claimant has consistently
> reported poor response to excessive heat, and that limitation has
> been addressed in the residual functional capacity.  The claimant
> has consistently sought appropriate treatment and has undergone
> appropriate testing, but overall, the physical examination has
> remained generally intact. Accordingly, the subjective factors in
> this case are consistent with the significantly restricted residual
> functional capacity outlined above, but do not warrant additional
> restrictions in light of the physical examination findings and range
> of daily activities including driving, self-care, shopping, light
> housework, and bill paying.

R. 22.

Plaintiff's self-completed disability reports and testimony at the hearing before the ALJ

confirm that his daily behaviors were not sporadic and transitory. In July 2007, Plaintiff reported

that he could do all household chores but had to stop and rest occasionally. R. 167. He indicated

that he would go outside daily and travel by walking, driving, or riding in a car and could ride

alone in a car. R. 168. He indicated that he would shop in stores for food or clothes for about an

hour a week and that he was able to handle money. *Id.* He stated that his hobbies were

computers, watching sports, fishing, and Playstation and that he did these activities daily and did

them well. R. 169. He further reported going out to coffee twice a week and going to church on a

regular basis. *Id.* He noted no changes in social activities since the onset of his disease. R. 170.

At the hearing, Plaintiff reported that he had driven he and his wife the 60-70 miles to the hearing and further stated that he had been elected the outreach chairperson for his NA chapter which required going out of town to meetings to see how other groups were doing. R. 58. He further indicated that he was involved with bible study, went to church regularly, and went to four NA meetings a week. He noted his ability to do some chores, play on the computer, and help with childcare. R. 62-63.

There is no suggestion that Plaintiff's activities were sporadic or transitory or that the ALJ improperly considered them in making his credibility assessment. In conjunction with the ALJ's reliance on Plaintiff's medical records as discussed above, the Court finds that substantial evidence supports the ALJ's credibility determination.

## V.    Conclusion

The Court has reviewed the ALJ's findings of fact and decision, and determines that his finding that Plaintiff was not disabled under the Social Security Act is supported by substantial evidence. Accordingly, the Court will grant the Commissioner's Motion for Summary Judgment, deny Plaintiff's and enter judgment in favor of the Commissioner.


An appropriate order will follow.


                                                       /s/ Arthur J. Schwab
                                                     Arthur J. Schwab
                                                     United States District Judge

cc: All counsel of record listed on ECF